Henry ANDERSON et al., Plaintiffs,

v.

Walter REDMAN et al., Defendants.

Civ. A. No. 76–364.

United States District Court,
D. Delaware.

Feb. 16, 1977.

Gary A. Myers and H. William Schab, Jr., Community Legal Aid Society, Inc., Georgetown, Del., for plaintiffs.

Norman A. Barron, Keith A. Trostle and John A. Parkins, Jr., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This civil rights action brought under 42 U.S.C. § 1983 and various State statutes by and on behalf of convicted State inmates and pre-trial detainees held at the Delaware Correctional Center (DCC) seeks injunctive relief to alleviate the overcrowded living conditions at DCC. Defendants, sued only in their official capacity, are the Warden of DCC and the Acting Director of the Department of Correction of the State of Delaware.

Although there was a seven day trial which concluded on December 3, 1976,[1] there was virtually no disagreement as to the operative facts. Lack of factual controversy is attributable to the parties having entered into a comprehensive stipulation of facts [2] and most of plaintiffs' primary trial witnesses having been DCC and Department of Correction personnel. Nevertheless, a detailed statement of the facts is essential to understand plaintiffs' challenge to the overcrowded conditions at DCC.

### THE PHYSICAL PLANT AND DISBURSAL OF PRISON POPULATION [3]

DCC is located two miles north of Smyrna, Delaware. It was constructed during 1970–71 and initially was occupied in April of that year. At that time the DCC complex encompassed seven structures:

(1) The administration, pre-trial, hospital and receiving cell building.[4]
(2) The maximum security building.
(3) The medium security building.
(4) The minimum security building.
(5) The educational building.
(6) The vocational building.
(7) The chapel.

Thereafter, a gymnasium was constructed and in 1975, two prefabricated buildings (hereinafter MA–1 and MA–2) were constructed in the minimum compound adjacent to the minimum security building. Aside from MA–1 and MA–2 no other residency units have been erected since 1971.

#### Receiving Room Section

The receiving room consists of four cells, a shower room, hallway and two storerooms. The receiving room is separated from pre-trial by a solid steel door which is

---

1. Plaintiffs' motion for immediate relief made at the close of trial was granted in part on December 6, 1976. See p. 1121 infra.

2. Document No. 12.

3. The gravity of the problems at DCC dictated that an expedited brief schedule be set. As a consequence, this Opinion is written without benefit of a trial transcript and without attribu-

tion or for the most part without distinguishing between uncontradicted trial testimony and stipulated fact.

4. While the hospital and receiving room are in the same building as the pre-trial section, they have been excluded from the term "pre-trial" when used in the context of housing accommodations.

normally locked. The cells are adjacent and each measures thirteen (13) feet eight (8) inches in length, nine (9) feet nine (9) inches in width and eleven (11) feet four (4) inches in height. Each cell has one combination sink and toilet in a corner and one exterior window seven (7) feet high and two (2) feet wide. The front face of the cells consists of a barred opening with a barred door allowing a person in the hallway to look directly into the cells. The shower facilities consist of a room with three shower heads located across the hallway from the cells. Each receiving cell contains one hundred thirty-three (133) square feet of living space.

Each cell was equipped at time of trial with two sets of bunk beds, an additional single bed, and some mattresses placed on the floor. Persons in the cells are allowed access to the showers only when the two correctional officers assigned to the receiving room, who also have responsibility for intake processing, discharges, and preparation of men for court, have an opportunity to supervise the showers. No television is available for viewing in the receiving room cells nor are facilities provided for the storage of personal belongings.

The receiving room cells were not designed or originally intended to be used to house inmates for extended periods. Each cell or "bull pen" was to hold no more than two men during the initial commitment processing. The processing is done to ascertain the inmate's physical and mental condition to ensure that he would not present a threat to himself or to the general population. Individuals were to be held in the cells only during the initial commitment process. Shortly after DCC opened, the population pressure forced abandonment of the original plan and three additional bunks were installed in each receiving cell. Subsequently, continued overcrowding caused the receiving room cells to be used for not only pre-trial detentioners and newly sentenced inmates, but also convicted inmates. However, the majority of the inmates in

the receiving cells are pre-trial detentioners.

Although the receiving room population fluctuates, during the months of September, October and November of 1976, there were numerous instances of 60 or more inmates being held in the four receiving cells during the day with 24 sleeping in the four cells during the night. While inmates reside in the receiving room cells an average of two weeks, some have stayed for as long as six months.

Except for meals and the recreation periods given persons in pre-trial, inmates housed in the four receiving room cells are locked in the four separate cells during their waking hours. During this period, assuming 16 inmates per receiving room cell, each inmate has slightly over eight (8) square feet. At night the square footage allotment increases to slightly over twenty-two square feet per inmate, since only six inmates sleep in each cell. The remainder sleep on mattresses on the walkway floors of pre-trial tiers B and C.

### Pre-Trial Section

As originally designed, the pre-trial section, intended for residence of pre-trial detainees, consisted of a small television room, library room, dining-day room and 90 cells arranged in three tiers (A, B and C tiers).[5] In general, an inmate moves from the receiving room cells to the television room and then to the library room. Thereafter, when vacancies appear on the pre-trial cell tiers, persons housed in the library room (and television room) are moved to a cell on the basis of seniority.

### Pre-Trial Television Room

The television room in pre-trial measures eighteen (18) feet three (3) inches in length and twenty-five (25) feet seven (7) inches in width. The single metal door to the room has two windows, and is located across the hallway from the door to C tier walkway. The television room originally was designed for indoor recreation, television viewing and hobbies. Not surprisingly, it has no

---

5. There are 31 cells on A tier, 30 on B tier and 29 on C tier.

toilet, shower or wash basin facilities. Nonetheless, the room has been used for residency purposes for approximately one year. The television room generally houses 12 persons on single beds, the majority of whom are pre-trial detentioners. The square footage per resident inmate in the television room is 38.73 square feet.

Persons housed in the television room are locked in the room approximately 16 hours out of every 24 hour period. They are released only during recreation, commissary and library times and for meals. If a person secured [6] in the television room desires to use a toilet or wash basin, he must first orally summon a correctional officer to unlock the television room door and the door to C tier, since the toilet facilities of C tier are designated for use by inmates housed in the television room. The television room has no correctional officer assigned to it, and thus a secured inmate who desires to use the bathroom somehow must attract the attention of a correctional officer stationed elsewhere in the pre-trial building. This lack of any plumbing facility also dictates that inmates in the television room may take showers only at specified times.

### Pre-Trial Library Room

The library room measuring twenty-four (24) feet five (5) inches in width and fifteen (15) feet five and one-half (5½) inches in length was designed originally for use as a library by pre-trial detainees. The library room has not been used as a library for over one year. The room has within it six sets of double bunk beds, approximately 18 inches apart, and has been generally used to house 12 persons. As in the television room, there is a mixture of pre-trial detentioners and convicted persons. The single metal door to the library is separated from the correctional officer's station by a distance of somewhere between twenty (20) to thirty (30) feet, and is on a different hallway from the three cell tiers. The library has no mechanical or electrical device for summoning correctional officers and has no toilet, shower or wash basin facilities. Inmates are locked in the library for approximately the same period as those in the television room, and encounter similar problems when desiring to use any bathroom facilities. The allotment of space for an inmate living in the pre-trial library is approximately thirty-two (32) square feet.

### Pre-Trial Cell Tiers

The individual pre-trial cells measure ten (10) feet in length, six (6) feet six (6) inches in width, and eight (8) feet nine (9) inches in height.[7] The cells in each tier face a tier walkway measuring one hundred-one (101) feet in length and eight (8) feet in width. All three cell tiers are secured by a locked door on one end and a lockable door which opens into the central hallway on the other end. Each tier has one shower room with three shower heads. Cells on tiers A and B contain in one corner a combination basin and toilet. Cells on C tier have no toilet or basin, but at the end of C tier is a bathroom consisting of three wash basins, two toilets and three urinals. The doors to cells on A and B tiers must be opened electronically by a correctional officer while the cell doors on C tier are under the control of the occupant who is given a key to the door of his individual cell.

Each cell in pre-trial was designed and intended for occupancy by a single person, providing approximately sixty-five (65) square feet of living space. Accordingly, the design capacity for the pre-trial section is 90 persons. As early as 1972, however, the design capacity was exceeded when 15 additional bunks were installed in the cells on the left side of A tier to accommodate the population increase. This reduced the available living space per inmate to thirty-two and one-half (32½) square feet per cell.[8]

6. There are certain "bathroom times" each day when all residents of a secured area are provided access to bathroom facilities.

7. Unless otherwise noted, all individual cells at DCC conform to these measurements.

8. Inmates (and particularly pre-trial detentioners) coming from the pre-trial library or television room initially are placed in one of the double occupancy cells in A tier. This is the tier in pre-trial considered to be the most secure. Following residency in a double cell in A

Furthermore, because of overcrowded conditions in the receiving room when the receiving cell population exceeds 24 persons, the excess sleep on mattresses placed on the floor of the walkways in B and C tiers. At the time of trial approximately 15 to 20 inmates were sleeping on a regular basis in each of the two walkways.

In summary, the pre-trial section consisting of the cells, library and television room was originally designed to accommodate 90 inmates for sleeping and residence purposes. Overpopulation at DCC has now caused it to be crammed with 129 inmates or 43 percent in excess of design capacity.

### Hospital

The hospital, with a design capacity of 26, consists of seven wards, an isolation room (ram-room) and a treatment room, all arranged around a single hallway. Two of the wards were designed originally to house ill persons on a short term basis with nine persons in each ward (D and E wards), a third ward was designed to house four individuals (A ward) and the remaining four wards were designed for one individual per ward (B, C, F and G wards). The treatment room was never intended to be used for residence of any person, ill or non-ill.

Despite the design concept, inmate population pressure has caused the hospital to be used to house healthy inmates for the last two to three years, including about six inmates for protective purposes. Six inmates now reside in A ward while 15 to 20 inmates are housed in each of D and E wards. Three inmates live in each of the two wards designed for one person and five inmates are in the treatment room. In other words, the hospital permanently houses an average of 50 inmates, only nine of whom can be classified as physically ill or who objectively manifest bizarre behavior (inmates who are "emotionally disturbed").[9] Thus, the hospital has been operating at about 100 percent

in excess of design capacity, notwithstanding that approximately 80 percent of the hospital population is not in need of medical care.

If one aggregates the overpopulation of the pre-trial building, including the pre-trial cells, the library and television room, both of which were never intended for permanent occupancy, the receiving room which was never intended for permanent occupancy, and the hospital which was never intended for permanent occupancy by healthy inmates, there are 243 inmates in permanent residence in an area designed for 90 inmates or at best 116 inmates[10] for an excess of either 170 percent or 120 percent of capacity.

### Medium Security Building

The medium security building contains 137 cells arranged in two wings of three tiers each, an inmate dining room, a staff dining room, one library room in each wing, and a kitchen which serves the entire population at DCC. Each cell has a steel door with a window and each tier has a shower room. All cells except those on D and E tiers have toilets and wash basins within them. D and E tiers each has a communal bathroom with toilets and wash basins. Inmates residing on these two tiers have keys to their individual cells.

The staff dining room, with a single entrance, measures forty-four (44) feet eight (8) inches in length by twenty-nine (29) feet one (1) inch in width. Notwithstanding the fact that it only has a small bathroom containing a single toilet and hand basin and no shower, population pressure at DDC has caused it to be used for permanent residential purposes for at least twenty months. In recent months, the staff dining room has been accommodating between 30 and 34 inmates. Assuming the latter figure, the square footage allocated to each inmate is thirty-eight (38) square feet. As could be

tier, an individual will finally move to a single cell in A, B, or C tier.

**9.** This figure breaks down to an average of six medical residents and three emotionally disturbed residents.

**10.** This figure is derived from adding the design capacity of the hospital (26) to the design capacity of the pre-trial cells (90).

expected, the completely inadequate bathroom facilities very often require an inmate to summon a guard in order to use other facilities in the medium building.

The library in each wing measures eighteen (18) feet four (4) inches in length by eleven (11) feet nine (9) inches in width. The library rooms, designed for reading or other recreation, have no toilet, shower or wash basin facilities, with the consequence that a man housed in one of the former libraries must attract the attention of a guard to allow that inmate to use a bathroom. For the last six months population increases have caused the libraries to be used for permanent residence. Six inmates live in each library room providing approximately thirty-six (36) square feet of living space per inmate.

Overall, the medium building houses 183 inmates, or 33.5 percent in excess of capacity.

*Minimum Security Building and Annexes*

The minimum security building consists of four tiers, a dining-day room, a multipurpose room and a library room. Two of the tiers consist of 26 cells, each fronting on a tier walkway. While the individual cells do not contain a sink or toilet, each cell tier is provided with a communal bathroom containing toilets, wash basins, and a shower room.

The remaining two tiers are large open rooms measuring eighty-four (84) feet in length by thirty (30) feet two (2) inches in width. These rooms were designed as dormitories and each has a bathroom with four wash basins, three toilets and two urinals, and an adjacent room with four shower heads. One dorm in minimum is occupied by 45 inmates, resulting in an allocation of approximately fifty-six (56) square feet per inmate, while the other is occupied by 51 inmates, resulting in an allocation of approximately fifty (50) square feet per inmate. Each dormitory originally was designed to hold 42 inmates, which would have allotted each inmate sixty (60) square feet of living space.

The library room in minimum measures twenty-eight (28) feet one (1) inch in length by ten (10) feet eight (8) inches in width. As in the medium building, the original design did not contemplate use of the library as a permanent residence, and, therefore, it has no toilet, basin or shower facility. However, unlike most other areas at DCC being used for permanent residence but not designed for that purpose, the lack of bathroom facilities is not as onerous since for the most part the inmates have unrestricted access to the entire minimum building. The small library room has been used since June of 1976 to house 12 inmates in six double bunk beds, resulting in an allocation of thirty (30) square feet per inmate.

The overcrowding in minimum is significantly less than pre-trial or medium. There are only 18 inmates above the original design capacity of 142, or 12.6 percent in excess of capacity.

In June 1975, two prefabricated buildings (MA–1 and MA–2) with a design capacity of 45 inmates per building were opened. The prefabricated buildings are of open dormitory design although one of them has been subdivided by partitions into smaller group rooms. The prefabricated buildings also have succumbed to the population pressure. One of the prefabricated buildings now houses 55 inmates, 22 percent over design capacity, while the other building houses 50 inmates, 11 percent above design capacity.

*Maximum Security Building*

The maximum security building contains 72 cells, 9 of which originally were designed for isolation or solitary confinement. It plays only a tangential role in this litigation. The maximum security building is not overcrowded, in terms of use of physical facility, in that each cell was designed for occupancy by a single individual and all cells in that building have continued to be used in that manner. DCC personnel and Department of Correction personnel candidly testified that notwithstanding the intense population pressure, it was their professional opinion that the personality and

behavioral patterns of those classified to maximum make it very unwise to initiate any steps to overcrowd the maximum building.

## THE EFFECTS OF OVERCROWDING

The effects of the overcrowding described in the previous section are felt by each inmate from the time that he first enters the institution. The effects derive from two sources: (1) those stemming directly from the overcrowded conditions; and (2) those resulting indirectly from the inability of an overburdened staff to meet the basic needs of the expanding prison population.

The most immediate impact is on the inmate's actual living quarters. As previously described, overcrowding has caused rooms not designed for occupancy to be used to house inmates, and living areas designed for occupancy to house inmates in numbers exceeding their design capacity. The assignment of inmates to dormitories and double cells is based solely on considerations of space availability and seniority; no attempt is made to ascertain the compatibility of those individuals who will be living together. Furthermore, the use of areas not intended for housing in most instances serves to deprive the inmate of exercise and recreational areas. Under normal circumstances, these areas very likely would have a positive effect on inmate attitude and behavior, and under overcrowded conditions, would seem virtually indispensable in helping to alleviate the tensions and frustrations generated by the overcrowding. To escape these overcrowded living arrangements, some inmates have requested confinement in isolation cells or in maximum security. They are more than willing to forego the few privileges they have in exchange for safety and privacy.

The overcrowded living conditions directly affect the psychological well-being of the inmates. Cramped and suffocating quarters increase tension, hostility and aggression, and exacerbate any personal problems an inmate may have, thereby intensifying his anxiety and fear.[11] Adequate control and supervision of the living areas by the correctional staff is impossible, privacy is non-existent and the noise levels are intolerable. An inmate cannot move without getting in another inmate's way. Constant stress, increased tension, and utter frustration generate conflicts and senseless violence over petty matters. Civilized human discourse among inmates and between inmates and staff is suppressed. Even the time during which a prisoner can see visitors has been cut in half. The cumulative psychological impact of these conditions on the individual prisoner is extremely negative.

The total lack of privacy and the excessive noise level accompanying overcrowding have adversely affected the physical and emotional well being of the inmates, causing irritation and distraction to all. This is evidenced by the disproportionate increase in the number of self-inflicted injuries, suicides and attempted suicides. Instances in which inmates inflict harm on themselves occur three to four times a month.[12]

Idleness pervades DCC. Most inmates have nothing to do all day long and many more work only a short period each day. The vast majority spend their day amidst the overcrowded living conditions, doing little except perhaps staring at the television. Idleness diminishes inmate morale and is directly related to increased violence. Inmates who are idle spend much more time exposed to negative influences, decreasing their desire to engage in activities which might facilitate their ability to return productively to society.

11. An example of this is the case of an inmate who had a severe speech problem upon admission to the institution in that he constantly stuttered. He was initially placed in one of the overcrowded areas of DCC and his stuttering became worse. Upon his transfer to an individual cell, his stuttering stopped. He was later forced to move into a dormitory area and his stuttering returned.

12. One inmate recently hung himself in maximum isolation after requesting transfer from pre-trial because of harassment from other inmates.

The crowded conditions also have endangered the physical health of the inmates. The value of the hospital as a treatment facility has been diminished because it now is used primarily for inmate housing. Placement of persons in close confinement in the large living areas of the institution increases the likelihood of transmission of communicable diseases, particularly upper respiratory diseases.

Want of sanitary living conditions further aggravates health maintenance. The toilet facilities and sewage treatment plant at DCC are seriously overburdened. In fact, the sewage system has been overtaxed and partially inoperative since first installed. Some untreated sewage flows directly into the Smyrna River from the prison, posing environmental problems to the surrounding localities.

There has been a complete breakdown in the classification system and the incentive system at the prison. Delays are rampant both in making classification decisions and in implementing classification assignments. The quality of classification reports has decreased as the quantity of reports to be prepared has increased. Some inmates, for example those serving sentences of less than one year, simply are not classified at all. Since overcrowding has equalized the living conditions among maximum, medium and minimum, there is little incentive for inmates to seek a "less restrictive" environment.[13] There has been a concomitant breakdown in the rehabilitative program at the prison, including vocational training, educational programs, work release,[14] and educational release. Delays of several months are common before an inmate can enter a program. Short-term inmates are discouraged from enrolling in many programs. Once in a program, successful completion is often thwarted by the noise and other distractions found in prison living areas.

Finally, the overcrowding and understaffing have destroyed the morale of the correctional officers and the treatment staff in that they are unable to perform their jobs and are powerless to correct a situation deleteriously affecting the entire institution. The most severe problem facing the custodial staff is maintenance of control and security in the institution. In a number of areas the inmate-to-guard ratio is so great that a very dangerous situation exists, and any disturbance could easily become a major riot.[15] Taking into account leaves, sicknesses, vacations and incidents in other parts of the institution requiring additional personnel, it is not infrequent that in the late afternoon or at night entire buildings will be under the control of only one or two guards (if any) for extended periods of time. With insufficient staff to supervise living areas, there is also an increase in theft, assault, and homosexual rape, as well as a decrease in the amenities of daily life, e. g., the frequency of showers, the ability to go to the bathroom when secured in a converted dormitory, and the frequency of visits to the library or commissary.

The treatment personnel are equally handicapped in contending with the needs of an increasing population. Although an estimated 80 percent of the population at DCC needs or would benefit from psychological or psychiatric assistance, the Delaware Department of Correction employs only two psychologists for its entire prison population of approximately 1100 inmates [16] and no psychiatrists. By comparison, the American Correctional Association standard

---

13. There is actually some disincentive to move, because prisoners coming from maximum to medium, and from medium to minimum will most likely be coming from individual cells and going into dormitory areas for uncertain duration before becoming eligible (by seniority) again for a cell.

14. For all practical purposes, work release has disappeared at DCC. Most participants in the work-release program are transferred from DCC to Plummer House located in Wilmington.

15. Even minor incidents require a considerable amount of time to secure the particular building involved.

16. This figure includes institutions other than DCC.

is one psychologist for every two hundred inmates.

The two clinical psychologists serving the entire Delaware prison population have been assigned three functions at DCC: diagnosis, administration, and therapy. The diagnostic function involves testing potential parolees and persons to be pardoned as well as inmates seeking reclassification. The sheer volume of testing and reports has bogged down both the parole and classification systems.[17] As part of their administrative function, the psychologists must serve on the institution classification board. Undoubtedly a psychologist provides substantial help to the board, but this added responsibility further consumes his time. Because of these heavy administrative and diagnostic tasks, the psychologists have virtually no time for their therapeutic function. Ongoing individual therapy has been nonexistent for over a year, except to avert immediate crises. For group therapy, there is a nine-month waiting list.

The foregoing has been an examination of the primary effects of overcrowding on an institution-wide basis. The following will highlight some of the more severe problems affecting individual sections of DCC.

### Receiving Room Cells

Nearly all persons admitted to the institution initially are placed in the receiving room cells. Newly admitted individuals are often frightened, anxious, and hostile. They do not know what to expect from confinement and most are frustrated and upset about losing their freedom. Those who are hostile present a threat to the other persons jammed in the receiving room cells. Those who are timid and unsure become more so when they are forced to live in close proximity with aggressive persons. In spite of this, the treatment staff simply has neither the time nor the space to segregate prisoners according to age, offense charged, personality traits or prior criminal record. Similarly, the treatment staff is unable to perform psychological or psychiatric tests or give inmates a physical examination on admission. Physical examinations are often delayed by eight or more days after a prisoner arrives at the institution. Psychological tests are given only to those newly convicted inmates who receive sentences in excess of one year.[18] As a result of these practices, both the physical health and the safety of the receiving cell population is endangered unnecessarily.

Living conditions in the receiving room cells at the time of trial can only be described as barbaric. Two or more persons often had to lie in the same bed and others lay under the bunk beds. Other people locked in the cells stood or lay on mattresses on the floor. Some men would just stand against the cell front hanging onto the cell bars. Mattresses were placed against the cell's one open toilet. Those who wished to urinate had to stand on their own or another's mattress while doing so. Those urinating in the toilet would sometimes urinate on a mattress or even on another person. Those who wished to defecate had to rest their feet in a similar fashion. Odors from the defecations permeated the cells. Any person using the toilet must do so in front of all persons in his cell and in view of other persons in the hallway area who could see through the bars which enclose the cell. It is under these living conditions that the inmates spend most of their waking hours.[19]

---

17. Before the increase in population, test results were submitted to the parole board at least a week before the hearing. Now they may be as late as six weeks after the hearing.

18. For detentioners who upon admission appear to be emotionally disturbed, the treatment staff will perform the psychological testing without waiting for sentencing. This, however, is a rare occurrence.

    11 Del.C. § 6530 requires all inmates sentenced to a term longer than 90 days to go through the classification system. However, inmates whose sentences exceed 90 days but are not greater than one year are classified almost perfunctorily to minimum without the benefit of any psychological testing.

19. It was primarily because of these overcrowded conditions in the receiving room cells, containing for the most part individuals not convicted of an offense, that prompted the Court to grant certain interim relief on December 6, 1976.

The mattresses used in the receiving room, whether cotton or foam rubber, are filthy, without covers, and never sterilized or sanitized. Because of the overcrowded conditions the cells are filthy and vermin infested. Even the guards who work in the receiving room area have reported problems with lice. The cells are impossible to keep clean because of the number of inmates housed in each. The cells are so noisy that reading, sleeping and other forms of concentration are difficult if not impossible. During the summer months the temperature in the cells is oppressive.

At night (11:00 p.m.–8:00 a.m.), six persons sleep in each of the four receiving room cells. The remaining persons housed in those cells must sleep on mattresses placed on the floor of C tier and if necessary, B tier. The mattresses for sleeping on the floor are stored near the television room in the pre-trial area and are ragged and filthy. They are never sterilized or sanitized before being given to another person,[20] further endangering the health of the inmates who sleep on them. At times there have been no covers, sheets, pillows or blankets for the persons using the mattresses. Those who sleep in tier C must use the communal bathroom on that tier, making it difficult to keep that bathroom clean and sanitary.[21] Persons sleeping on the floor of B tier must use the toilet facilities in an individual cell located on the tier. A different cell is used each night. This presents numerous problems for the inmate whose cell is being used on a particular night by a large number of persons. Sleeping becomes very difficult and the likelihood of theft of his personal belongings increases. There is also a problem of thefts of the personal belongings of those sleeping on the tier floors at night, as these persons have no place to store their belongings safely. Thefts are also very common in the receiving room cells because there are no safe storage areas for personal items.[22]

At trial it developed that only one correctional officer was in the receiving room area on the twelve-to-eight shift. As a consequence of his necessary preoccupation with clerical duties, homosexual rape had become the norm in the receiving room cells.[23] The danger of this type of assault was so great that Lieutenant Ernest Hoffrage[24] has found it necessary to warn those individuals who are placed in the receiving room cells during his shift of the likelihood of assault, advising them of the three options available to them: (1) report any advance or attempt after it occurs; (2) resist the attempt on your own; or (3) submit. The first alternative is in most instances impractical because of fear of reprisal, leaving only the options of resistance or submission. Persons sleeping on the tier floors also are subjected to homosexual assault.

Assault and fights unrelated to sex also are commonplace in the receiving room cells. These outbreaks result from the cramped living quarters and from the policy of placing Rule 31 persons[25] in the receiving room cells.

20. It is even doubtful that an inmate from night to night sleeps on the same mattress.

21. The C tier bathroom also serves the inmates housed in the television room and library.

22. A few inmates are able to minimize theft of their personal possessions by giving them for safekeeping to inmates with their own cells in the pre-trial area.

23. With the ready cooperation and upon request by the Court, Warden Walter Redman, defendant herein, quickly placed an additional correctional officer trainee in the receiving room cell area on the twelve-to-eight shift whose duty was to keep all four cells under surveillance at all times. If the receiving room population drops below 13, the Warden may remove the additional officer.

24. Lieutenant Hoffrage, a correctional officer at DCC for 5 years, works the 4:00 p.m.—12:00 shift in the pre-trial section of the prison. He was called as a witness by plaintiffs.

25. Rule 31 persons are those transferred to the receiving room cells because they are a threat to the institution and other inmates or because they have been threatened with rape or assault by other inmates. The only other place for protective custody is the hospital, and its facilities are often full. *See* p. 1118, *infra.* Inmates placed in the receiving room cells for their own safety often refuse to leave the cells out of fear for their lives.

*Pre-Trial Section*

Movement throughout the remainder of the pre-trial area depends primarily on seniority. Persons from the receiving room cells generally move into the television room. During the afternoon recreation times the television room is used for indoor recreation and television watching by seventy-five to one hundred persons at a time, sitting on the same mattress beds that the residents of the television room sleep on at night. As a result, the television room is constantly dirty, as are the mattress beds. Secure storage of personal items in the television room is difficult because of the traffic in and out of the room.[26] The restricted access to the pre-trial library room makes it possible for inmates living there to store personal belongings more safely.

After residence in the television and/or library room, most inmates and particularly those who have yet to be convicted, will be assigned to a two-man cell on A tier. No screening of the compatibility of persons placed in these cells is undertaken. The double occupancy cells on A tier are extremely cramped. Two persons cannot move around the cell at the same time; one must remain on his bed during the other's movement. Only a passage of eight inches exists between the corner of the lower bunk and the toilet. There is no privacy in using the toilet facilities. Because the cells have no provision for the storage of personal belongings, inmates must store their possessions in cardboard boxes placed under the beds. Conditions in individual cells are much better, except that individuals on C tier must share their communal bathroom with inmates residing in the television room and library and receiving room inmates sleeping on the walkway.[27]

*Medium Security*

Once an inmate is classified from pre-trial to either the maximum, medium or minimum security buildings, he may wait for a number of months until a bed becomes available in the section to which he is classified. If his classification is to the medium building, his initial residency will be either in the former staff dining room or in one of the two former libraries.

The former staff dining room, housing as many as thirty-four inmates, is singularly ill-suited for residential purposes. Aside from the inadequate bathroom facilities previously noted, the temperature in the room is virtually uncontrollable. In winter, the room is extremely cold, serviced only by a single heating register. In summer months it is extremely hot; a condition that is exacerbated by the lack of ventilation adequate for occupancy purposes. Year round it is extremely noisy, because of its proximity to the kitchen. Moreover, all duct work from the kitchen runs through the room. This noise, particularly that from the kitchen fans, can be heard twenty-four hours a day, and prevents reading, letter writing and hinders the ability of inmates to sleep.

Overcrowding also has rendered the dining facilities in medium inadequate. Although a prison regulation prohibits inmates from eating in their cells (for health and sanitation reasons), it is ignored because the dining room cannot accommodate all the prisoners during a meal. The dining room further serves as a general recreation area and television room. Although a couple witnesses intimated that the dining room could be used by inmates as a quiet area for studying, other testimony revealed that the noise level there is not appreciably lower than in the staff dining room.

The use of the staff dining room and two libraries for residential purposes not only

---

**26.** The impact of this problem is lessened only by the fact that inmates in pre-trial are not allowed to have as many personal possessions as inmates in the rest of the prison.

**27.** The existence of a communal bathroom itself is not the problem, since it is made possible by the fact that inmates in tier C are given keys to their individual cells.

affects the inmates who are housed within those areas, but has a direct impact on the entire building. The tensions that build up as a result of living in these areas overflow to the entire building.[28]

Finally the incentive system within the medium building itself has completely broken down. The design of medium contemplated inmates moving from cells with sliding automatically locking doors to those where the inmate has a key to his own cell. Cell assignments now are governed by considerations of what space is available. The loss of this incentive system has had a negative impact on the inmates in the building.

### Minimum Security Compound

An inmate classified to minimum security will first reside in one of the two minimum dormitories in the minimum building for an average of five months before assignment to an individual cell. The dormitory concept originally was intended for housing inmates classified for work release, who would be out of the building for a number of hours each day. Accordingly, the need for individualized cells, within the attendant privacy and security they would provide, was not seen as critical. However, the function of the minimum dormitories has changed drastically as a result of the overcrowding and the cutback in the work release program. Presently, the dormitories

are used for general housing, and residents may spend most if not all of their day within the confines of the dormitory.[29] Both dormitories are extremely crowded, and at the time of trial, resort to double bunking had begun. Yet in light of the numerous problems stemming from placement of a large number of individuals in cramped quarters in a single room, no attempt is made to screen newly arrived residents to determine their suitability for or compatibility with such an environment.

The minimum dormitories suffer many of the same problems that plague the medium security staff dining room. The most oppressive problem is the noise level. Security is also difficult to maintain.[30] Fights and assaults take place on an average of four per week in the minimum building, mostly in the dormitories and the hallways. Eighteen major fights occurred between June, 1976, and the start of the trial, a substantially greater number than were observed for comparable periods in previous years. Thefts are relatively common, homosexual activity flourishes unabated,[31] and privacy is nonexistent. Maintenance of adequate security is further aggravated by the fact that certain pre-trial detentioners are also held in the minimum dormitories due to the shortage of space in the pre-trial building. These detentioners live under restrictions not imposed upon convicted persons living in the dormitories.

---

**28.** Another problem is that the composition of the medium population has changed. The typical medium inmate in the past was fairly settled, facing a fair amount of time to serve. Now, apparently with an overflow from minimum, there are inmates in medium who are less susceptible to control because of their short sentences.

If a thorough study were done on the effect of mandatory minimum sentences on increase of prison population, it is suspected DCC would discover it is on the threshold of another substantial, irreversible shift in the composition of the population. *See* pp. 1134–1135, *infra.*

**29.** Inmates in the minimum building, including those in the dormitories, generally have the run of the entire building. Inmates are rarely secured in the dormitory; the decision to stay in the dormitory during the day is primarily the product of nothing else to do.

**30.** Security problems relating to the inadequate number of correctional officers are particularly acute in the minimum compound. Because of the shortage of guards, coupled with the fact that much of their time is spent manning the gates between the minimum compound and the rest of the institution in order to regulate the flow of traffic between the two, there is often only one guard attending to the entire minimum building, and no guard attending to either of the minimum annexes. This situation is especially common at night.

**31.** By the time an inmate reaches his initial classification destination, be it maximum, medium, or minimum, it is difficult to discern nonconsensual homosexual activity, because the resistance of most nonconsensual victims has been broken by that time.

Inmate witnesses at trial also reported recent shortages of food and cafeteria trays. As a result of the tray shortage, the available trays must be washed during the middle of each meal so that each can be reused. This is not only an inconvenience, it is also a serious health problem, since the minimum building has no facilities for washing the trays properly.[32]

### The Hospital and Health Care Services

As a result of the increased population at DCC, the delivery of health care services in the institution has broken down.

The biggest problem is the status of the institution hospital. According to Dr. Krista Srivastiva,[33] the resident physician, he needs the full twenty-six beds that the hospital was designed to accommodate for medical purposes. However, the hospital presently is occupied by an average of fifty persons, few of whom are there for medical treatment.

Those living in the hospital solely because there is no room anywhere else at DCC suffer from boredom and idleness. These inmates are not permitted outdoor recreation,[34] or access to the commissary or library except through submission of written lists, and may not participate in educational or vocational programs. Except for six inmates who work, persons are locked in the hospital area twenty-four hours a day unless they have a visitor or meet with a lawyer or counselor. Even meals are eaten in their living quarters. The constant noise generated by healthy residents adversely affects the rate of recuperation of the patients.

The lack of available bed space often prevents persons diagnosed as sick from being placed in the hospital, at least until a residential inmate is moved out. When an inmate has a contagious disease, the problem of space is further complicated. During the trial no place could be found in the hospital for an inmate diagnosed as having an active and highly contagious strep condition. Although a person with active tuberculosis presently is housed in the hospital, during the time when the medical staff suspected that he had the disease but their suspicions had not been confirmed, he had to be kept in the general population because there was no place in the hospital. And immediately preceding the trial, an outbreak of scabbies occurred in pre-trial tier A. The inmates affected had to be quarantined in their own cells because there were no beds available in the hospital.

Since February, 1976, the daily sick call has tripled; yet there has been no increase in the size of the medical staff. As a result, the one institution doctor is unable to spend sufficient time with each patient to meet his medical needs. The incidence of one particular ailment has significantly increased—back and muscle pains—attributable to the number of inmates sleeping on the floor.

Persons referred to an outside hospital for surgery must await long periods of time to be admitted. Efforts to eliminate some of this waiting by performing minor surgery in the institution have been frustrated since inmates now live in the treatment room. Physical therapy and whirlpool treatments similarly are unavailable because of the conversion of this room to a living area.

### VIOLATION

Having described the physical layout of DCC and the general and specific effects of overcrowding, it is necessary to consider whether the resultant conditions constitute a violation of any State regulation or statute or, if necessary, a violation of the Constitution of the United States.

---

32. Normally the trays are washed after each meal in the kitchen in the medium building.

33. Dr. Srivastiva has served as the institution physician since February 1976. He was called as a witness by the plaintiffs.

34. The only exception is a rather elderly inmate who is permitted to take daily walks in the yard.

■ In 1972, class action litigation [35] between inmates of DCC and the State was settled upon agreement of the State to adopt a comprehensive set of rules for the treatment of inmates. The set of Rules adopted by DCC pursuant to the settlement and 11 Del. C. § 6535 [36] has become known as the DCC Inmate Reference Manual (IRM).[37] The IRM together with the numerous statutory provisions impose rather specific requirements on the operation of DCC. To the extent the IRM contains mandatory language, it has the same effect as a statute. *See Jenkins v. Keve*, C.A. 74–191 and *Davidson v. Keve*, C.A. 74–119 (D.Del.Sept. 20, 1974).

### Double Celling

■ There was uncontroverted evidence at trial that minimum public health standards for correctional institutions require single cells to contain sixty (60) square feet of floor space, with an eight (8) foot ceiling, and five hundred (500) cubic feet of air space.[38] All single cells occupied by one inmate at DCC meet this standard and in general comply with the IRM. However, the practice of double celling in A tier of pre-trial, instituted as a temporary measure in 1972 and continuing until today, violates paragraph 5 [39] of the IRM, since double celled inmates have little more than one-half the required living space. Moreover, the practice also violates IRM paragraph 4(1),[40] since a four year period in no way fairly can be characterized as "temporary overcrowding."

### Dormitories and Dormitory Like Settings

■ Unlike single cells, none of the dormitories and areas converted to dormitories comply with prevailing minimal health standards. To satisfy these requirements, dormitories and converted areas must provide a minimum of seventy-five (75) square feet per inmate.[41]

Currently the two dormitories in minimum—the only areas originally designed for use as dormitories—house at least 50 inmates per dormitory, resulting in an unacceptable allocation · of only fifty (50) square feet per inmate.[42] As originally designed, these two dormitories were built to house 42 inmates [43] or an allocation of sixty (60) square feet per inmate. The original design concept envisioned use of the mini-

35. *Wilgus v. Peterson*, C.A. 4263 (D.Del.Dec. 5, 1972).

36. 11 Del. C. § 6535 provides:
    "The Department shall promulgate rules and regulations for the maintenance of good order and discipline in the facilities and institutions of the Department, including procedures for dealing with violations. A copy of such rules shall be provided to each inmate. There shall be a record of charges of infractions by inmates, any punishments imposed and of medical inspections made."

37. PX–1, Exh. G. The IRM has the same legal effect that is ordinarily accorded regulations of a State agency.

38. Standards for Health Services in Correctional Institutions—An Official Report of the American Public Health Association at p. 62 (1976).

39. IRM paragraph 5 provides:
    5. All accommodations provided for the use of inmates and in particular all sleeping accommodations shall meet all requirements of health, due regard being paid to climate conditions and particularly to cubic content of air, minimum floor space, lighting, heating and ventilation.

40. IRM paragraph 4(1) provides:
    4(1) Where sleeping accommodation is in individual cells or rooms, each inmate shall occupy by night a cell or room by himself. If for special reasons, such as temporary overcrowding, it becomes necessary for the administration to make an exception to this rule, it is to be done with the recognition that it is not desirable to have two prisoners in a cell or room.

41. Standards for Health Services in Correctional Institutions, *supra*.

42. This figure proportionately decreases when more than 50 inmates are crowded in one dormitory as is now occurring.

43. At the opening of DCC or shortly thereafter, three bunks were added to each dorm, raising the occupancy level to 45 inmates per dorm or an allocation of fifty-six (56) square feet per inmate.

mum building to house prisoners on work or educational release. If the original design limitation and concept had been followed, sixty (60) square feet per inmate could well be acceptable, because the dormitories would not be inhabited a substantial portion of each day. The present conditions of mass humanity and enforced, destructive idleness pervading DCC including the dormitories in minimum, coupled with the virtual absence of any work and educational release programs operated from DCC and the paucity of educational and vocational programs at DCC, compels the Court to insist upon compliance with the standard of seventy-five (75) square feet per inmate. Given this requirement, the two minimum dormitories may properly accommodate 34 inmates each.

■ Use of the B and C tier walkways as sleeping areas for the overflow from the receiving room cells violates IRM paragraphs 4(2),[44] 5,[45] 8,[46] and 7.[47] Use of the former library in pre-trial (thirty-two (32) square feet per inmate), television room in pre-trial (thirty-nine (39) square feet per inmate), two former library rooms in medium (thirty-six (36) square feet per inmate) and library in minimum (thirty (30) square feet per inmate), all without any available toilet facilities (except by ultimately summoning a guard) violate the uncontradicted seventy-five (75) square feet per inmate requirement read into IRM paragraph 5 and

IRM paragraph 7.[48] Similarly, use of the former staff dining room (thirty-eight (38) square feet for each of 34 inmates) with only one toilet and sink[49] also violates IRM paragraph 5[50] and paragraph 7.[51]

### Hospital

There was uncontradicted testimony that the hospital, designed to administer health care services to a maximum of 26 inmates, if needed, is being used to house more than 50 inmates. Of the inmates housed in the hospital, an average of five or six and no more than ten inmates are physically ill requiring hospitalization at any one time. At the time of trial, the hospital was also housing three emotionally disturbed inmates and a few individuals segregated for their own protection. Over 40 inmates and detentioners in the hospital are quartered there for want of any other available bed space, even though those confined to the hospital have virtually no privileges and are locked in the hospital area 24 hours per day.

■ The doctor for DCC testified, and I accept, that the design capacity of 26 beds is needed by the hospital to function properly. Even if all 26 beds never are occupied at one time, it is of paramount medical importance to have readily available space for emergency medical isolation.[52] Accordingly, utilization of the hospital for general housing renders impossible the providing of adequate health care services in violation of

**44.** IRM paragraph 4(2) provides:

4(2) Where dormitories are used, they shall be occupied by inmates carefully selected as being suitable to associate with one another in those conditions. There shall be regular supervision by night, in keeping with the nature of the institution.

**45.** See p. 1119, n. 39, supra.

**46.** IRM paragraph 8 provides:

8. Adequate bathing or shower installations shall be provided so that every inmate may be enabled and required to have a bath or shower at a temperature suitable to the climate, as frequently as necessary for general hygiene according to season, but at least three per week.

**47.** IRM paragraph 7 provides:

7. The sanitary installations shall be adequate to enable every inmate to comply with the needs of nature when necessary and in a clean and decent manner.

**48.** Id. As noted earlier, the inmates in minimum generally have access to the entire building and thus normally need not summon a correctional officer.

**49.** Minimum public health standards require that in dormitory style living, flush toilets be available in the ratio of 1 to 8 inmates. Two-thirds of the toilets may be urinals.

**50.** See p. 1119, n. 39, supra.

**51.** See p. 1120, n. 47, supra.

**52.** The present inability of the medical staff to

both IRM paragraph 17(2)[53] and Delaware State law.[54]

### Receiving Room

■ The Court found conditions in the receiving room as described at pp. 1107–1108 and 1114–1116, *supra*, to be so barbaric and inhumane as to warrant instant remedial action. Further, the State virtually conceded in open court on December 6, 1976, that conditions in the receiving room cells could not pass constitutional muster. As a consequence and because arguments predicated upon Delaware statutes[55] and the IRM had not been fully developed a finding was made that "conditions in the receiving room cells constitute cruel and unusual punishment under the Eighth Amendment of the Federal Constitution as incorporated in the Fourteenth Amendment of the Federal Constitution, and further that such conditions work a denial of due process under the Fourteenth Amendment as to individuals charged, but not convicted of any criminal offense. . . ."[56] Pursuant to that finding, an Interim Order was entered reducing the maximum population permitted in the receiving room cells to twenty inmates. The subsequent clarification of plaintiffs' State law claim leads the Court to conclude that the conditions existing in the receiving room area at the time of the Interim Order violated every IRM provision relating to accommodations.[57]

### Classification

Thus far, the identification of violations caused by overcrowding has focused on various areas of the institution. Trial testimony of the DCC personnel established without contradiction that overcrowding has directly contributed to a breakdown of the system of classifying inmates. An inmate classification system, the heart of any correctional institution, not only determines the required custodial level of an individual but also establishes a scheme of goals to allow a person to obtain benefits from the correctional process after identifying his vocational, educational, mental and physical needs. Moreover, classification, including housing assignments, has been mandated by the Delaware Legislature[58] and forms an

isolate inmates with contagious diseases or ailments is documented *supra*, p. 1118.

**53.** IRM paragraph 17(2) provides in part that "[w]here hospital facilities are provided in an institution, their equipment [and] furnishings . . . shall be proper for the medical care and treatment of sick inmates. . . ."

**54.** 11 Del. C. § 6536 provides in part:
"The Department shall promulgate reasonable standards, and shall establish reasonable health, medical and dental services, for each institution, including preventive diagnostic and therapeutic measures or both an out-patient and hospital basis for all types of patients."
*Cf.* Del.Const., Art. I, § 11 for the requirement that in the construction of jails a proper regard be had for the health of prisoners.

**55.** 11 Del. C. § 6501 *et seq.*

**56.** Doc. No. 20.

**57.** *See* pp. 1119–1120 nn. 39–40, 44–47, *supra*.

**58.** Overcrowding has made a mockery of the Legislative directives as to classification found in 11 Del. C. §§ 6530, 6531:
§ 6530. Classification committee; information.
Immediately after a person who has been sentenced to 90 days or more of imprison-ment is received at any institution under the jurisdiction of the Department, a classification committee shall obtain and file complete information with regard to such person. Similar records may be compiled on persons sentenced to less than 90 days, in accordance with rules and regulations of the Department. When all such existing available records have been assembled, each such classification committee shall determine whether or not any further investigation is necessary, and, if so, it shall make such additional investigation. Each classification committee shall determine and prescribe the custodial and rehabilitation program and the care for each person coming under its jurisdiction. The classification committee shall determine the persons who shall work and labor and shall assign persons to jobs, studies and programs according to their abilities and in the manner best calculated to effectuate their training and rehabilitation. Review for reclassification shall occur periodically in accordance with the Department's regulations, or whenever the committee shall deem it advisable.
§ 6531. Treatment programs; classification.
Persons committed to the institutional care of the Department shall be dealt with humanely, with effort directed to their rehabilitation, to effect their return to the community as safely and promptly as practicable.

**1122**

integral part of the system of incentives and rewards central to the proper functioning of DCC.

■ The DCC classification system, which almost from the start did not function properly because of overcrowding, has broken down completely; not even the most minimal goals of classification are accomplished. Due to the increase in number of inmates without a corresponding increase in staff, the classification process presently consumes an inordinate amount of time. Similarly, the quality of classification reports has decreased under the pressure of quantity. Most importantly, once classification is determined, the implementation of the classification plan is delayed at least two to three months during which time an inmate may languish unproductively in pre-trial or at his prior classification level. Frequently, classification assignments are based solely on what space is available rather than a considered evaluation of the security needs of the institution and what best would facilitate the inmate's productive return to society. This disregard for or delay in implementation of classification not only demoralizes and frustrates the inmate, but directly contravenes the statutorily mandated classification requirement.

In view of the massive, uncontestable [59] evidence of overcrowding and its effect at DCC put forward by DCC and Department of Correction personnel, it is not surprising that following the trial, defendants ultimately conceded

"that the housing of pre-trial detentioners in other than single cells is done in violation of the *Rules for the Treatment of Inmates in the Delaware Correctional Institutions* and 11 *Del. C.* § 6526(b). It would follow therefore, that the housing of pre-trial detentioners in converted libraries and converted day rooms would likewise violate the above provisions. Finally, the defendants concede that the manner of housing convicted persons violates rules and regulations in the *Rules for the Treatment of Inmates in the Delaware Correctional Institutions* as adopted by the Department of Correction, and 11 *Del. C.* § 6531." [60]

■ The foregoing violations all have been predicated upon nonfederal grounds, either Delaware statutes or the IRM. This is in no way intended to imply that plaintiffs failed to demonstrate federal constitutional violations. Rather, it represents adherence to the general rule that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The Supreme Court affirmed the importance of this principle in *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39

The Commissioner shall establish the following programs, and may establish others: Education, including vocational training; work; case work counselling and psychotherapy; library and religious services; commissary; and shall institute procedures for the study of classification of inmates for these purposes. Subject to the limitations of existing structures, rooms for the housing of inmates shall have adequate privacy, light and sanitary facilities and personal needs, including facilities for visits by relatives and friends, shall be provided at a normal level.

Since section 6531 was enacted into law prior to construction of DCC and DCC was not then an "existing structure," the qualification to the statutory mandate is inapplicable to DCC.

**59.** The term "uncontestable" has been chosen advisedly. Plaintiffs' overwhelming volume of damaging testimony came in large part from DCC and Department of Correction personnel. While the attorneys for the defendants did their best, no testimony or evidence was proffered to controvert stark, dismal facts.

**60.** Doc. No. 35 (Letter from Assistant Attorney General Keith A. Trostle to this Court, dated Jan. 12, 1977). This document goes on to explain that "[n]o evidence was introduced at trial by the defendants to counter these claims nor did defendants respond to these claims in their post-trial reply brief. A fair inference was drawn by the plaintiffs that the defendants lack of response illustrated a tacit concession of these legal issues. By this letter, the defendants openly concede the above claims made by the plaintiffs."

L.Ed.2d 577 (1973) in which it read *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), to hold "that the state issues should be decided first and because these claims were dispositive, federal questions need not be reached." *Hagans, supra,* 415 U.S. at 546, 94 S.Ct. at 1383. It is therefore clear "a federal court properly vested with jurisdiction [61] may pass on the state or local law question without deciding the federal constitutional issues" and may then "dispose of the case solely on the nonfederal ground." *Id.* at 547, n. 12, 94 S.Ct. at 1384.

Confident of jurisdiction, attention is now turned to the formulation of an appropriate remedy for the State law violations. The development of a remedy for State law violations requires careful balancing of the desirability of minimizing federal intrusion [62] into what is essentially a State matter against avoidance of judicial timidity in the face of gross and continuing violations which State officials seemingly are unable to correct unless and until supplied with the protective succor and warmth of a federal court order.[63]

## REMEDY

### *Double Celling and Dormitory Like Settings*

The State law violations found by the Court obviously preclude continued use of the library and television room for permanent residence and use of the walkways on the tiers in pre-trial for temporary sleeping quarters. Similarly, housing inmates in the staff dining room and two libraries in medium as well as the library in minimum must cease. Finally, double celling in A tier in pre-trial resulting in less than sixty (60) square feet per inmate and the practice of overcrowding the dormitories in minimum resulting in less than seventy-five (75) square feet per inmate can no longer be permitted. Most, if not all, of the foregoing, has been tacitly or openly conceded by defendants.[64]

### *Receiving Room*

Since the four receiving room cells each contain one hundred thirty-three (133) square feet, there appears to be no reason why the original design capacity of two inmates per cell cannot be followed, although it is perhaps not the most desirable option. Further, so long as the IRM and State law do not provide otherwise, the four receiving room cells can be used for permanent housing when not required for new detentioners or newly sentenced persons. Accordingly, the four receiving room cells will be considered part of the residential design capacity of DCC in determining the maximum permissible population. This approach provides defendants with the flexibility to use the cells more efficiently if not needed or ultimately not used for their intended purpose.[65]

---

61. Federal jurisdiction in the instant case derives from plaintiffs' claim under 42 U.S.C. § 1983 that present conditions of overcrowding constituted cruel and unusual punishment. Since clearly not a frivolous contention, jurisdiction vested with the Court to consider not only the federal claim but the pendent state claims as well. Resolution of the pendent state claims has now made resolution of the federal constitutional claim unnecessary.

62. *Cf. Evans v. Buchanan,* 416 F.Supp. 328, 351 (D.Del.1976).

63. For example, the State in effect conceded that previously existent horrid conditions in the receiving room cells were constitutionally impermissible. Nevertheless, it required a court order before relief was forthcoming to plaintiffs. Once armed with an Order (and presumably protection from potentially irate State legislators), they responded promptly by temporarily reducing the prison inmate population to 644 although the Court Order required a reduction only to 700. Also the receiving room population was reduced temporarily to one when the Court Order only required a reduction to 20.

64. *See* p. 1122 and n. 60, *supra.* All cells as originally designed at DCC meet the sixty (60) square feet requirement while projected new dormitories meet the seventy-five (75) square feet requirement. *See* Doc. No. 24.

65. The latter situation could arise since the present receiving room area without expansion may prove inadequate to handle the increasing number of new inmates.

## Hospital

■ Unlike the receiving room area, the design capacity of the hospital should not be considered in determining the residential design capacity of the institution, nor should it be considered as an area suitable for permanent housing of detentioners and convicted persons. This conclusion is compelled primarily because indiscriminate use of these beds to house healthy inmates prevents the hospital from fulfilling its intended health care purpose. On the other hand, while the doctor in charge of the hospital testified he needed the twenty-six bed capacity, he also testified that normally no more than ten physically ill inmates require hospitalization at any one time. Although less than ideal, it is appropriate to permit the hospital to be used in certain circumstances for the temporary segregation of inmates for their own protection and temporary housing of inmates who are emotionally disturbed but are refused admission to mental health institutions. To assure the availability of proper medical care and hospital bed space, the hospital may be used as temporary living quarters at any one time for no more than 10 individuals who are either emotionally disturbed and/or in need of protective isolation.

## Classification

If one simply aggregates the total number of beds available for permanent housing, the resulting figure is 508.[66] This number has been alluded to previously as the residential *design capacity*. However, to establish 508 as the permissible capacity for the present DCC facility, would be to ignore a concept fundamental to the purpose and proper operation of DCC. The inmate classification system, mandated by statute, forms the basis for the system of incentives and rewards developed by the Department of Correction to assist the rehabilitation process. Moreover, inmate housing and the privileges attendant to assignment to the different buildings play a prominent role in this incentive system. Uncontradicted testimony from DCC personnel established that the housing classification system, and, in turn, the entire classification process cannot work if the institution is filled to design capacity. For example, an inmate who has earned the right to live in the minimum building may have an extended wait until a bed becomes available, or an inmate who has not earned that right may be assigned to minimum simply because that is where space is available.

■ Those same individuals testified housing classification becomes impeded unless eight to ten percent of the beds used for permanent housing of convicted inmates are not occupied. Accordingly, the aggregate existing and future design capacity of DCC will be reduced by eight percent [67] to determine the maximum capacity of DCC before classification to housing becomes impeded (hereinafter referred to as "classification capacity"). This eight percent factor will not be applied to pre-trial because an individual is not classified unless convicted and then only if sentenced to 90 days or more.[68] Thus, the current classification capacity of DCC is 475 inmates. In order to permit necessary flexibility, defendants will not be required to hold vacant eight percent of the beds in each building or in each living area of a building, although application of the eight percent factor to the institution as a whole presumably will result in a random distribution of vacancies sufficient to permit immediate inmate assignment or reassignment upon classification to housing.

■ Finally, in recognition of the fact that defendants cannot control the volume of admissions on any one particular day or group of days but only can adjust to rapid increases by releasing individuals in order to comply with the order to be issued by this Court, the inmate population will be permitted to exceed 475, subject to the following limitations: (1) under no circumstances will the total inmate population

---

66. *See* p. 1125, *infra.*

67. Rounded off to the closest whole number.

68. 11 Del. C. § 6530.

ever be permitted to exceed design capacity; (2) the total inmate population may not exceed classification capacity for more than 72 consecutive hours at one time; and (3) the total inmate population shall never exceed the classification capacity for an aggregate of more than 30 calendar days in any one year.[69] In sum, design and classification capacity and hence maximum permissible inmate population subject to adjustment to reflect new construction are as follows:

|  | | Design Capacity | Classification Capacity |
|---|---|---|---|
| Receiving Room Cells | | 8 | 8 |
| Pre-Trial | | 90 | 90 |
| Minimum | | 120 | 111 |
| Cells | (52) | | (48) |
| Dorms | (68)[70] | | (63) |
| Medium | | 137 | 126 |
| Maximum | | 63[71] | 58 |
| MA–1 | | 45 | 41 |
| MA–2 | | 45 | 41 |
| Total | | 508 | 475 |

## IMPLEMENTATION OF REMEDY

■ In light of the State's reluctant concession that conditions at DCC violate State law,[72] and the above analysis of the capacity of the institution, the remedy for the conceded violation is clear: reduce the inmate population. The issue is when this remedy should be put into effect.

The State of Delaware has put into the record evidence of its plans to expand the housing facilities at DCC by renovation and new construction. The Court has been advised that the State has completed renovations to convert an unused area in the vocational building to a dormitory with a design capacity of 42.[73] Although ready for occu-

pancy, the new dorm remains unused because no funds have been appropriated by the Legislature for the necessary additional staff.[74] Further, defendants state that the Delaware Youth Center (DYC) located at Dover, Delaware, will be available on May 1, 1977, to relieve DCC of 58 inmates either short term or classified to minimum. Defendants also have submitted their plans for the construction of two prefabricated dormitories that meet the standards set forth in this Opinion and have a design capacity of 45 each. Finally, evidence was adduced at trial that the Legislature has appropriated funds for a new 48 bed maximum security facility to be built at DCC and that a bill will be introduced in the State Senate to authorize construction of a new three hundred bed facility at a site not yet known.

■ These proposals by the State represent an important initial step toward ameliorating the present conditions at DCC. If the State, however, is suggesting that any remedy for its violations of State law should be predicated upon its long range plans for building a new 48 bed maximum security facility and a new 300 bed facility, its position is untenable for several reasons. First, notwithstanding the crisis at DCC, the proposed maximum security facility has not yet been put out for bid and could not be completed optimistically before 1979. Second, testimony brought out at trial established that for the past sixteen months the average net gain per month in prison population has been 14. Thus, if past trends are any guide, the 48 bed facility would be filled within three and one-half months of its projected opening in 1979. Defendants have not suggested what to do

**69.** Obviously the figure of 475 for classification capacity and 508 for design capacity will be modified should the State construct new housing for inmates at DCC.

**70.** Allows seventy-five (75) square feet per inmate since the minimum dorms are not now being used as intended in the original design concept. See pp. 1119–1120, supra.

**71.** The punitive isolation cells in maximum are not considered part of the permanent residential housing capacity in maximum.

**72.** See p. 1122 and n. 60, supra.

**73.** Interestingly, without benefit of this Opinion, the State also settled upon seventy-five (75) square feet as the minimum amount of space required per inmate in a dormitory.

**74.** Even if the appropriation is forthcoming, it will take an additional 5 to 10 weeks before the renovated area can be used because of the training necessary for newly hired personnel. Doc. No. 33.

about the net increase of 14 per month for the intervening construction period of two to three years. Similarly, even if the bill authorizing the new 300 bed facility were passed tomorrow, it will neither stop the present trend of population increase nor provide housing for the additional 14 inmates incarcerated each month during its three to four year construction period. Third, the long history of overcrowding at DCC detracts from the State's attempt to paint a picture of legislative resolution and determination to face up to its responsibilities promptly and maturely. Fourth, the recent passage of laws imposing mandatory, minimum sentences and mandatory consecutive sentences for many crimes can only further increase the inmate population pressure at DCC.[75] Finally, Department of Correction personnel testified that the population level has exceeded the emergency capacity of DCC for a number of months prior to trial. They criticized the present situation as one in which the institution was critically and dangerously overcrowded.[76] For all of these reasons, it seems neither wise, prudent nor practical to tailor a remedy to proposed construction, the majority of which at best is three to four years from completion and at worst might never be built.

Accordingly, the remedy will be predicated upon what steps the State can reasonably be expected to take in a relatively short time to provide adequate inmate housing. Further, the remedy will take account of the fact that notwithstanding the December 6, 1976, Interim Order, DCC is still operating far above emergency capacity.

██ The State has indicated its only short-term solutions for the overcrowding of DCC consist of renovating the Vocational Education Building to house 39 inmates (design capacity of 42) and constructing two pre-fabricated buildings to house 41 inmates each (design capacity of 45). As noted earlier, the Vocational Education Building is ready for occupancy but no funds have been appropriated for additional staff, notwithstanding State prognostications that inmates would move in by December or early January. The Court has been advised by the State that money has been appropriated for the pre-fab buildings and they will be ready for occupancy by July 1, 1977. Thus, theoretically by July 1, 1977, the classification capacity at DCC will be increased by 121 additional dormitory beds (design capacity of 132).[77] Consequently, the total projected classification capacity at DCC as of that date would be 596 (design capacity of 640). The only other immediate measure proposed to relieve the overcrowding at DCC is that as of May 1, 1977, DYC will be available to house 58

---

75. Imposition of mandatory minimum and mandatory consecutive sentences is a political judgment. *See* pp. 1134–1135, *infra*. As such, it represents the political process at work and the wisdom of such collective decisions should not be questioned by a federal court. However, when a political judgment results in overcrowded conditions at a penal institution in violation of a State law over which a federal court has jurisdiction, that violation as distinguished from the political decision is properly a matter of judicial concern. *See* pp. 1122–1123, *supra*.

76. The full significance of this situation is discussed *infra*, p. 1127.

77. The construction of dormitories is the most inexpensive way to add beds but is most costly in human values, as evidenced by the fact that guards and inmates both commonly refer to dormitories as "jungles":

"Single occupancy cells are preferred for the following reasons: (1) The single cell provides maximum security from the escape point of view; (2) it provides most flexibility in classification and separation of prisoners; (3) it provides maximum protection to jail personnel by not requiring them to deal with more than one unruly prisoner at a time; (4) it helps prevent homosexual activity; (5) it assists in the elimination of fights, physical exploitation and other forms of difficult behavior; (6) it limits the degree of contamination between more and less sophisticated inmates; and (7) provides privacy." W. Nagel, *The New Red Barn: A Critical Look at the Modern American Prison* at 24 (1973).

However, the selection of housing type is a political judgment, properly the province of the Legislature so long as it complies with State law. The proposed dormitory settings are in compliance with State law.

other inmates serving short terms and/or classified to minimum.

This Court has noted above its desire to minimize intrusion into State affairs. Under normal circumstances, the court might be willing to wait until July 1, 1977, before ordering remedial relief to take effect. But these are not normal circumstances and the most compelling testimony about the urgency of the situation at DCC centered around the "emergency capacity" of the institution.

The emergency capacity of 600 was defined by State officials as "the population beyond which the institution must be considered critically and quite properly dangerously overcrowded." [78] Moreover, they informed the Court that a population at this level could not be safely maintained with any degree of certainty for longer than six months. However, at the time of trial, the prison population had exceeded the emergency capacity of 600 for 12 months and had exceeded 700 for five months.[79] In other words, DCC officials presently are sitting on a powder keg capable of explosion at any time.

This appraisal was confirmed by the testimony of DCC personnel. Practically all of the DCC and Department of Correction personnel who were questioned on the point, either directly stated or strongly intimated that because of overcrowding, security at the institution is necessarily substandard; DCC possesses the potential for a devastating "blow up"; and portions of DCC can go out of control at the whim of the inmates. The accuracy of such testimony has been in part corroborated by the 22 escapes from DCC during calendar year 1976 [80] and the numerous assaults on correctional officers and other staff, including the dozen in which the victim required medical attention.[81]

▇▇▇ Against this picture of DCC as a ticking time bomb must be weighed the fact that the inmates are convicted criminals, and in order to reduce the prison population to even emergency capacity involves certain risks. The difficulty of this balancing is compounded because it weighs the certainty of potentially undesirable, but perhaps minimal consequences of ordering interim reduction [82] against the uncertainty of inaction with a potential for disastrous consequences. Putting aside for the moment the right of a prisoner to proper housing and the right of a correctional officer to relatively safe working conditions, the remaining interest at stake is the right of the citizens of Delaware to be secure in their persons and property. The issue is whether an order to reduce the inmate population immediately to emergency capacity thereby limiting the possibility of random escapes by dangerous inmates better serves these citizens than an order which permits the present threat of a riot to continue with the concomitant possibility of a mass escape. Although the release of any inmate involves certain risks, those released pursuant to a controlled reduction are the least likely to present a threat to society.[83] Two factors

---

**78.** The State also stated emergency capacity would increase from 600 to 642 with completion and occupancy of the renovated portion of the Vocational Education Building. Occupancy has not occurred. *See* p. 1125, *supra.*

**79.** Doc. No. 37 (Trial Exhibit—Stipulation of Facts with Exhibits), Exhibit F.

**80.** Unfortunately the Court was unable to ascertain the human cost of the 22 escapes in terms of the offenses committed by an escapee. The only information available to the Court is that three of the escapees are currently in the custody of other states for crimes allegedly committed after their escape, including murder and rape.

**81.** *See* Doc. No. 37.

**82.** *See* pp. 1129–1130, *infra.*

**83.** The enunciation of a governing criterion for release of "least likely threat to society" is patterned after the overriding consideration for release on parole in Delaware. *Cf.* 11 Del.C. § 4346(b). Nonetheless, it is only stated as a suggestion. There may be long termers who committed heinous crimes, but who in the judgment of corrections personnel are not likely or are the least likely of all inmates to commit any offense in the future—for example, a homicide which was the product of passion. Based solely on the criterion of threat to society, it might be better to release this hypothetical long-termer than the release of a relatively short-termer who in the judgment of corrections personnel is almost certain to commit other offenses. These criteria and decisions on

dictate resolving this trade-off in favor of ordering an immediate reduction in prison population at DCC to its emergency capacity of 600: (1) The State of Delaware can minimize the possible undesirable effects of early release through intense supervision; and (2) even if the State constructs all of the proposed housing, discussed above, by July 1, the maximum permissible capacity of DCC will be 596 (design capacity of 640) and thus the same reduction would be required at that time. Therefore, the defendants will be ordered to reduce the inmate population to the emergency capacity of 600 by March 15, 1977.

In summary, the State has undertaken to increase by July 1, 1977, classification capacity to 596 (design capacity of 640). If 58 additional inmates are removed to DYC prior to the July 1st date and the inmate population continues to increase at the rate of 14 per month, and DCC is reduced to its emergency capacity of 600 by March 15, 1977, DCC on July 1, 1977, should have an inmate population slightly below classification capacity. The primary problem facing the State of Delaware at that time will be that there are no other facilities available to handle any further increase in prison population until more housing facilities are constructed and staffed.

### AVAILABLE ALTERNATIVES TO OVERCROWDING AT DCC

■ Ordinarily, and quite properly, this Opinion would terminate at this juncture. Because the remedy to bring DCC into compliance with State law is shaped on the premise that there are viable options available to the State of Delaware to protect its citizenry, some of those options and the predicate for their consideration will be set forth below. It should be stressed that these are suggestions and in no way constitute mandatory requirements or conditions imposed on the defendants.

To recapitulate, at the time of trial as many as 760 inmates had been warehoused at DCC with the resultant overcrowding being in violation of State law. Further, current statistics had shown a net increase in prison population of 14 persons per month over the past 16 months with no sign of abatement. The Order outlined in the previous section will remedy the current crisis caused by past inaction. This portion of the Opinion analyzes methods by which the citizens of Delaware can be protected and the overcrowding of DCC eliminated. Any approach must be capable of relatively immediate implementation and must focus on reducing the excess DCC population with minimum danger to the general population of Delaware and at the lowest possible financial cost. There are two basic ways to achieve this: (1) divert people from DCC who do not pose an undue risk to society and (2) reduce the number of inmates at DCC classified to minimum [84] where overcrowding has caused costs to increase at a greater rate than in any other section of the prison.[85]

With these goals as a premise, the final section of this Opinion surveys a variety of alternatives that could help alleviate present and prospective overcrowding problems at DCC. The discussion will attempt sequentially to examine those alternatives in the order that they would be encountered by an individual from the time of his initial

early release are best left in the hands of corrections personnel and others, who, to date, can proudly point to a record in premature release cases that has been successful beyond reasonable expectation. *See* pp. 1129–1130, infra.

84. Inmates classified to minimum are primarily of two types: (1) those serving "short" sentences, i. e., generally 3 months or less and (2) those nearing the end of a longer term. The former contribute to what is an overriding problem at DCC: its uneconomical use as a county jail or lock-up for short term offenders

who do not require the degree of security present at DCC.

85. *Correctional Standards for Delaware: A Cost Analysis of Present Operations and Policies of the State's Correctional System* by J. Byrne and D. Yanich in consultation with D. van Tijn at 30 (Table 2.4) (December, 1976). This study and report were funded under LEAA Discretionary Grant # 75–ED–03–0003 awarded to the Delaware Agency to Reduce Crime for Development of Criminal Justice Standards and Goals for the State of Delaware (hereinafter cited as *"DCS, supra"*).

contact with the Delaware criminal justice system. Thus, attention is turned first to possible methods of diverting a person from incarceration where incarceration would appear to serve no useful purpose. Next, there is examined what may be a dysfunctional utilization of DCC and its custodial personnel to hold certain offenders. Third, programmatic methods for ameliorating an inmate's reentry into and adjustment to society are discussed. Finally, this section briefly examines a reevaluation of sentencing policies as a way to minimize the role of the prison as an institution for higher education in crime.

### Diversion Prior to Incarceration

Substantial numbers of non-serious offenders are detained in default of low bail (defined as $1,000 or less) set by magistrates. These detentioners are subsequently released within several days either because they make the original bail or because the Superior Court orders a reduction in the amount of bail. There is presently a bail screening program, which if not in existence, would result in tying up 88 additional beds at DCC.[86] An in depth study[87] of Delaware pre-trial services concluded that the program could be expanded to make available as many as 35 additional beds[88] without releasing on bail anyone who otherwise would not be released within a short period of time.

At present, the Delaware criminal justice system does not have a uniform system of pre-trial diversion, especially at the Justice of the Peace level where the participants more often than not include only a police officer, the hapless defendant and the Justice of the Peace. Usually no representa-tive of the Attorney General of the State of Delaware is present[89] either to prevent prosecution, or, if a prosecution and conviction result, to recommend against incarceration.

The above suggestions of bail reform and placement of a deputy attorney general at the Justice of the Peace Court seek to avoid unnecessary incarceration. The following discussion focuses upon post-conviction diversion.

### Post-Conviction Diversion

As to convicted individuals, the fact that classification capacity slots are at a premium raises the question of whether inmates should serve their full terms at DCC. There is a certain hard core element who, upon release, are a threat to society. This group should be incarcerated as long as their sentence permits and should not be the beneficiary of any early release program. This group, however, does not make up the entire population of DCC. It has now been rather conclusively established that the recidivism rate at DCC is 8.8 percent at the end of 6 months; 16.8 percent at the end of 1 year; 24.1 percent at the end of 18 months; 30.8 percent after 2 years; 36.8 percent after 30 months and 42.4 percent after 3 years.[90] After 3 years it is unlikely an individual will return.

At bottom, the advantages of early release for certain offenders must be weighed against the social costs. An excellent illustration of the potential in saving public funds and in making classification space available for those who do constitute a threat to society without apparently seriously endangering the community is the release of 78 inmates following this Court's

---

86. *DCS, supra* at 304 (Table G–I).

87. *Delaware Pretrial Services, Division of Adult Corrections, State of Delaware* (January, 1975). This report was prepared by the Division of Urban Affairs, University of Delaware.

88. *DCS, supra* at 279 (Table 5.4 c).

89. At present, there is only one assistant attorney general assigned to magistrates hearing misdemeanor cases in New Castle County and none in Kent or Sussex Counties. No defend-ant convicted of a misdemeanor with the deputy in attendance has been sentenced to incarceration unless a mandatory minimum sentence (30–60 days) was involved.

90. *DCS, supra* at 198 (Table 4.7). The authors of *DCS* studied only the recidivism of serious offenders (average term of 20 months) and the percentages measure only the likelihood of their return to DCC over time.

December 6th Order. None of those inmates had more than six months remaining on his sentence and some had far less. Assuming hypothetically the mean time left to serve was 3 months to parole eligibility or end of sentence or in the case of detentioners, 3 months until they reach trial, one can simply take the number of inmate days (78 x 90) multiplied by the cost of keeping an inmate per day at DCC ($21.38—*DCS, supra* at 209—Table 5.1) and arrive at a cost savings to the State of Delaware slightly in excess of $150,000. Against the $150,000 saving and additional available space must be charged the cost to the community, i. e., the number of individuals returned to DCC and the offense committed.

To date, 4 have been returned. The first was originally sentenced to 6 months by Wilmington Municipal Court for criminal mischief and third degree assault and was returned by the same Court on charges of criminal mischief and disorderly conduct. The second, originally sentenced to a term of 5 months and 20 days by a Justice of the Peace for civil contempt, was returned after a subsequent conviction for being intoxicated while walking on the highway. The third, originally sentenced to 5 months for civil contempt by a Justice of the Peace, was subsequently convicted on January 4, 1977, by a Justice of the Peace for disorderly conduct and sentenced to 10 days, and now must serve the balance of his original sentence which will expire on March 12, 1977 (at an additional cost of $1,282 to the taxpayers). The fourth, originally sentenced by a Justice of the Peace to 40 days for trespassing and menacing, was returned the day following release on a commitment

by a Justice of the Peace for an unknown offense in default of $1,000 bail. He completed his original sentence (at an additional cost of $427), when mercifully the Court of Common Pleas permitted him to sign his own bond in order to enter an alcohol detoxification unit where he probably belonged in the first instance. The question which the State Legislature and criminal justice system must answer is whether the saving of $150,000 and the opening up of 74 classification spots for offenders who are a serious threat to society outweigh the cost to society of 4 minor crimes? [91]

### Supervision

According to the testimony given at trial, DCC is 30% understaffed in custodial positions and 57% understaffed in the institution as a whole. The Department of Correction has requested an additional 86 staff members, including 46 correctional officers, to supplement the existing total of 152 custodial, counselling, and support personnel.[92] Assuming 238 people (152 plus 86) are genuinely needed,[93] the resulting ratio is 1 staff person to every 2.5 individuals, assuming the institution is filled to its projected classification capacity of 596.[94]

The unanimous testimony of correction personnel leaves no doubt that this ratio, albeit expensive to maintain, is necessary to operate a secure institution. Nonetheless, the statistics raise some serious questions. Accepting the 2.5/1 ratio as essential to the proper operation of DCC, does it make financial or common sense to use a prison facility to house minor offenders? Did the 78 inmates released pursuant to the Order of December 6, 1976, require continued in-

---

**91.** The success rate of the 78 inmates released because of the Court's Order is so unexpectedly high in terms of the low number of returnees (4) and the minimal severity of the offenses that one is compelled to search for explanations. Common sense dictates that either DCC, Department of Correction personnel, and others possess a high degree of expertise in making subjective judgments on early release as does Superior Court Judge Walsh in making adjustments to bail, or that no useful purpose was being served by incarcerating at least 74 of the 78 or both.

**92.** PX–71.

**93.** In light of the necessity for manning around-the-clock shifts and the present drastic understaffing of DCC because previous requests for additional personnel were rejected, 238 does not appear an unreasonable number. Indeed, although plaintiffs placed the figure into evidence, it was based on a document prepared by defendants.

**94.** This figure, of course, assumes occupancy of the vocational building and two proposed prefabricated buildings.

carceration at the public's expense in view of the success rate?[95] How many others like the released 78 still are incarcerated at DCC at a cost of $21.38 per day each? Can the failure to reform the present bail system so that accused persons who are imprisoned for two to ten days before being freed on bail need not go to DCC at all be justified to the Delaware taxpayers who are footing the bill for this inefficiency? Can the State of Delaware afford the financial and social costs of incarcerating individuals who do not require incarceration and incarcerating others longer than is necessary to protect society?

What would be the result if selected prisoners were put out on the street under close supervision? Even an unprecedented ratio of one supervisor for 15 inmates would still be five times less expensive (and no cost for physical plant) than the current DCC staff to inmate ratio. The answers to these questions are properly resolved through the political process, not by opinion of this Court.

Obviously there is a limited group of offenders for whom complete diversion from incarceration or early release is appropriate. Nevertheless, there is a larger group of offenders whose reentry into society may be eased substantially by their participation in structured programs. These programs could aid significantly in reducing the pressure for new construction and the expense of the correctional system. Moreover, the assumption of these programs is that recidivism may be reduced if the offender does not serve his entire sentence incarcerated in a prison. The next section examines a few of the alternatives available to the State.

## Work Services

This program is currently in operation in Delaware but is restricted geographically to New Castle County. In lieu of a sentence at DCC, an offender in work service is assigned to a community project that should take the same approximate time to complete as the sentence of incarceration. The work consists primarily of odd jobs for the State, which must be done sooner or later. With work services they can be done sooner and cheaper with two additional benefits: (1) Expense of incarceration is either avoided completely if there is post conviction diversion from incarceration or reduced to the extent the offender is permitted to work during the latter portion of a short sentence (6 months or less); and (2) Past experience indicates some of these otherwise unemployable individuals are retained by the employing State agency after the work-service obligation has been discharged.

The present program is designed as an alternative to incarceration for those sentenced to 60 days or less, and diverts approximately 50 individuals from DCC.[96] With a minimal staff increase of two persons,[97] an additional eighty individuals could be diverted from incarceration at DCC.[98] If the number of those individuals qualifying for complete diversion fell below available capacity, suitable inmates classified to minimum who are nearing the end of their incarceration period (2 months or less) could be brought into the program to reduce costs and the housing shortage in minimum.[99]

95. *See* pp. 1129–1130, and n. 91, *supra.*

96. *DCS, supra* at 228 (Table 5.4 a).

97. *DCS, supra* at 307 (Table G–3).

98. *Id. See also DCS, supra* at 229 (Table 5.4 c).

99. An example would be the mandatory minimum sentences imposed under 21 Del.C. §§ 2756, 2758 and 4177 (second offense). Quite possibly, no time or a very short time in DCC (no more than 10 days) combined with work services could accomplish the same objective of preventing recidivism. The issue, stated differently, is whether the additional time of incarceration (20 to 50 days) prevents a repetition of the offense other than during the short period of incarceration. If the answer is "yes," the work services program should not be used for these particular mandatory minimum individuals, but could be used for other offenders. If the answer is "no," work services is an ideal program for these offenders. If the legislative response is "it doesn't know," it might consider whether in view of the crisis at DCC, it should attempt to obtain some answers by endorsing experimentation.

## Halfway House

■ The State of Delaware at one time had a Halfway House, but it was discontinued when funding was cut-off. The purpose of such a facility is to house short term offenders in a minimum security environment with an emphasis on a community oriented program, that is, finding out how the offender will function when released and attempting to minimize any apparent adjustment problems.[100] Counsellors can provide invaluable help by arranging job interviews, encouraging educational enrollment, identifying useful public and private services and putting the ex-convict in contact with appropriate agencies. Whatever the limitations on the resources of a Halfway House, it offers the inmate more than the present arrangement of freedom and a bus ride to Wilmington.

The cost per inmate at a Halfway House has been calculated at $9.56 per day[101] or $11.82 less than the cost per day of incarcerating an inmate at DCC.[102] There are enough convicted persons sentenced to six months or less to fill 72 beds in a Halfway House, thereby relieving pressure for construction of an additional 72 beds at DCC.[103]

## Work Release

The work release program is geared to assist the inmates' reentry into the community as they approach the end of their prison term of more than one year. In general, they are housed in a minimum security environment and provided jobs in the community as part of the effort to ease adjustment upon release. At present, the capacity of the Work Release Center in New Castle County[104] (Plummer House) is 63 beds.[105] This means that the program can accommodate 90 inmates at one time because when in full operation, 27 are away from the facility and in the community for the last month on extended supervision.[106] Under the present program, a portion of the wages are used to pay room and board, further reducing the net financial cost to the State of Delaware. The cost per inmate at Plummer House is $5.75 per day[107] or $15.63 less than cost per day (exclusive of construction cost[108]) of an inmate incarcerated at DCC.[109] Moreover, by expanding work release to include inmates who do not constitute a threat to society, irrespective of their sentences, the program could involve at least an additional 27 inmates. This expansion to 90 beds or 117 inmates

---

100. Although certain problems may exceed the scope of the program, taking the first step towards solution of such problems certainly would not be beyond the program's purview.

101. *DCS, supra* at 308 (Table G–4). In addition to the $9.56 per day there is a construction cost of $604 per year per bed assuming a 20 year bonded indebtedness at a 7% interest rate. Because of more stringent security requirements at DCC, the cost of construction there is at least double that of a minimum security installation not built as part of the DCC complex.

102. The cost per day of incarceration of an inmate at DCC exclusive of construction cost is $21.38. *DCS, supra* at 209 (Table 5.1). This figure is based on a population of 610 but will not appreciably change with a classification capacity fixed at 596.

103. Cost of operation of a 72 bed Halfway House would cost $851 per day less than the same number of beds at DCC, for an annual savings of $310,615.

104. Sussex Correctional Institution, the only other major prison facility in Delaware, located in Georgetown, Delaware, also has a work re-

lease program with an institution based housing facility.

105. *DCS, supra* at 228 (Table 5.4 a).

106. *DCS, supra* at 228–29 (Table 5.4 b and n. 11).

107. This includes a deduction for project income, i. e., contribution by the inmate of a portion of his earnings. In addition to the $5.75 per day cost there is, as with a halfway house, construction cost of $604 per year ($1.65 per day per inmate) assuming a 20 year bonded indebtedness at a 7% interest rate. Because of far lesser security needs, the cost of construction is approximately half of that at DCC.

108. *See* n. 101, *supra.* By confining the figures to operating costs, one can draw accurate cost comparisons uncomplicated by differing construction costs.

109. $21.38 per day. *See* n. 102, *supra.*

would further relieve the need to construct 27 additional beds at DCC.[110]

### Furlough

Furlough is a term employed to describe early release of selected inmates serving six months or less. If such a program existed it would provide a much needed, positive incentive to short term prisoners to conform their conduct to an acceptable level and get involved in institutional programs.[111] Further, it would fill the gap left open by the targeting of work services and work release. By releasing on furlough for the last 20 days of a two-month sentence and for the last 15 days of a three to six month sentence,[112] the State can relieve pressure for construction of an additional twenty-one beds at DCC.[113] Since an inmate is not housed in any State facility while on furlough, the direct cost saving is $21.38 per day per inmate. If the program were fully utilized, the daily savings would be $449 and the annual savings $164,000. Against this amount must be charged the $184 it would cost to supervise each individual released on furlough.[114]

### Human Services Programs: G.E.D. Program

The G.E.D. (General Equivalency Degree) program is an educational program conducted within the institution which permits a motivated inmate to obtain a high school equivalency diploma. Because of inadequate staff and overcrowding, there presently is a waiting list for enrollment in the G.E.D. program. The rate of recidivism among those who have successfully completed the G.E.D. program has been reduced by 11.6 percent,[115] saving the State of Delaware $111,887 [116] between January, 1971, and August, 1976. Stated more meaningfully, because of successful completion of the G.E.D. program, 10 more people have not returned to DCC who otherwise would have become repeat offenders.[117] This figure is relatively small, but it is important because it represents one of the few programs at DCC which at least has started to reduce the recidivism rate for serious offenders.[118] Another means of attacking the recidivism problem might be a fundamental re-evaluation of sentencing policy.

### Sentencing Policy—First Period of Incarceration

The programs discussed above assume that recidivism will be reduced if an offender does not serve his entire sentence at DCC. One must consider equally, however, the likelihood of recidivism if he does serve his whole term. Extended institutionalization turns a novice at crime into a hardened criminal. This education might be avoided if an individual were forced to experience the loss of liberty imposed by incarceration for a period long enough to appreciate the loss of freedom, but not long enough to become hardened and accustomed to being only in a criminal element. The question without a clear answer is whether the ini-

110. *DCS, supra* at 228–29 (Table 5.4 b, and n. 11). Conversely, if the State Legislature chooses not to continue funding its successful existing work release program, there will be a resultant pressure on DCC for construction of an additional 90 beds (63 presently living in Plummer House plus 27 on extended furlough). Further the cost of corrections will jump at least $985 per day which translates into an additional $359,000 per year.

111. It is assumed that with relief of overcrowding and sufficient legislative appropriation, defendants will discharge their statutory responsibility in implementing programs to attempt to induce an additional change so that when an inmate returns to the community, he is no longer a threat to society.

112. *DCS supra* at 228–29 (Table 5.4 c and n. 11).

113. *DCS, supra* at 227 (Table 5.4 c).

114. *DCS, supra* at 310 (Table G–6).

115. *DCS, supra* at 198 (Table 4.7). *See* n. 90 *supra.*

116. *DCS, supra* at 207.

117. *DCS, supra* at 181 (Table 4.4).

118. The value of the few other human services programs at DCC is unknown because no studies have been done.

tial sentence to incarceration of certain offenders should be short, such as 15 to 30 days followed by a period of intense supervision. The obvious disadvantage of this policy is that while a short sentence might and probably will divert a significant number of individuals who otherwise would end up as confirmed criminals and recidivists at a later date, initial short sentences expose the community to commission of other crimes at an earlier date by those not affected by the shock of incarceration. Resolution of this trade-off is properly left to the State Legislature and the State courts.

This brief examination of alternatives to warehousing inmates at DCC has omitted of necessity discussion of other possibilities, and touched only briefly upon a coordinated pre-trial diversion program, further development of human service programs, the various potential uses of intense supervision and re-evaluation of sentencing policy. The absence of any data analyzing the cost of these alternatives and the length of this Opinion dissuade one from any additional elaboration. Nonetheless, they are important options that merit careful consideration.

In summary, if the alternatives previously discussed were implemented and adequately staffed, the pressure to construct an additional 35 beds either at DCC or at a new prison would be virtually eliminated. Such an effort would further result in annual savings of approximately $1,526,074:[119]

| | No. of Beds Saved | Annualized $ Saving |
|---|---|---|
| Bail Reform | 35 | $ 273,129 |
| Work Service | 80 | 624,296 |
| Halfway House | 72 | 310,615 |
| Work Release (Increase) | 27 | 154,034[120] |
| Furlough | 21 | 164,000[121] |
| | 235 | $1,526,074 |

### Mandatory Minimum Sentences

One important caution must attach to the foregoing analysis which has as its predicate the need to reduce the number of inmates classified to minimum and thereby ease the pressure for construction of additional beds.[122] Since the data for the release statistics and projections[123] of the DCS study[124] were based on the last quarters of calendar years 1972, 1973 and 1974, the study does not reflect the effect of recent mandatory minimum sentence legislation.[125]

Little is known about the importance of mandatory minimum sentences as a cause of the increased inmate population and consequent pressure for more beds at DCC. However, it is known that "the percent

119. Because no analysis of the cost of certain programs and policies discussed in this section has been done, the total annual saving derived therefrom is not included in the chart.

120. $184 supervision cost per case not deducted.

121. Minimal cost of extended supervision for the last month of work release has not been deducted because no figures are readily available.

122. See p. 1128, supra.

123. DCS, supra at 222.

124. DCS, supra at 151 (Table 3.5).

125. Examples of mandatory minimum legislation (without probation or parole) passed or modified by the Delaware Legislature are: 11 Del.C. § 1447 (1973) and (1974)—5 year mandatory minimum sentence for possession of a deadly weapon during commission of certain types of felonies; 11 Del.C. § 832 (1974)—10 year mandatory minimum sentence for a second robbery conviction coupled with a prohibition against concurrent sentences arising out of the same incident and a 3 year mandatory minimum sentence for a first robbery offense; 11 Del.C. § 4209 (1974)—held to constitute life sentence without parole for persons convicted of first degree murder; 11 Del.C. § 4214 (1974)—habitual criminal statute provides in most instances for a life sentence without probation or parole; 16 Del.C. § 4751(b) (1974)—manufacture, delivery or possession or intent to sell certain drugs—30 years without eligibility for parole; 16 Del.C. § 4751(c) (1974)—manufacture, delivery or possession or intent to sell certain drugs where death results through use—45 years mandatory minimum without eligibility of parole.

increase in average sentence equals the percent increase in the average inmate population."[126] This direct correlation can produce a startling impact on the increase of prison population over time. For example, if imposition of mandatory minimum sentences causes an average increase of 20 percent[127] in the length of *all* sentences at DCC (from 3.9 months to 4.7 months) and one started with a sentenced population of 383,[128] one would have 461 inmates incarcerated at the end of twenty-four months.[129] In other words, there would be a net increase of 78 inmates at DCC due solely to imposition of recently passed mandatory minimum legislation.[130]

Use of mandatory minimum sentences, mandatory concurrent sentences and restrictions on early release are also policy decisions properly the province of the Legislature.[131] The decision to protect the public by these laws inherently involves a significant cost, namely the commitment of substantial tax dollars to pay for the institution and staff necessary to separate convicted persons from society. But it seems clear that if present mandatory minimum legislation remains in effect and pending mandatory minimum legislation[132] becomes law, the State of Delaware may not only have little choice but to follow some or all of the alternatives previously discussed, but also may have to build and staff additional prisons to implement its sentencing philosophy.

In conclusion, relief has been ordered in this case because the State of Delaware has failed to adhere to its own statutes and regulations. To rectify these violations, the Court has ordered a two stage remedy. By March 15, 1977, the inmate population at DCC will be reduced to the institution's emergency capacity of 600. By July 1, 1977, the inmate population of DCC will be reduced to the classification capacity of the institution as of that date. If, as the State has represented repeatedly, additional residential facilities are in operation by July 1, 1977, the State need release only four more inmates, for the classification capacity of DCC will be 596.[133] If all of the new facilities are not in operation, the permissible capacity of the institution will be less than 596; the exact classification capacity obviously will depend upon the extent the State's performance matches its representations.

As the last section of this Opinion has emphasized, this remedy only deals with the current crisis at DCC. The future course the State will follow is unclear. Any policy decision must have as a primary goal the safety and security of the citizens of Dela-

---

126. *DCS, supra* at 143.

127. It should be emphasized that this is a hypothetical percentage figure used to illustrate a point. The actual impact of mandatory minimum sentences imposed as a result of legislation passed since 1973 may be a greater or lesser percentage.

128. The actual sentenced population is now much higher.

129. *DCS, supra* at 142.

130. Notwithstanding that the precise effect of mandatory minimum sentences on increased inmate population at DCC has yet to be determined, certain basic conclusions can be suggested. Specifically, prison statistics show that the DCC population grew during fiscal years 1975 and 1976. During this period, the detention population remained constant, whereas the sentenced population increased rapidly. (*DCS, supra* at 114 (Table 3.1), 115 and 121.) These figures demonstrate that the increase in prison population is not the result of an increase in crime, since an increase in crime should have caused increases in both detention and sentenced population.

131. The Legislature, as the elected body politic, could decide not to implement any of the alternatives. For example, Senate Bill 72 introduced at the current session of the General Assembly would prohibit inmates serving a term of imprisonment for a Class A or a Class B felony from receiving a furlough taking part in a work-release program or an educational release program except for the last six months of their term. While passage of this bill would not frustrate all of the alternatives set forth above, it would deprive DCC and Department of Correction personnel of necessary flexibility.

132. Senate Bill 3 pending in the Legislature provides for a 3 year mandatory minimum sentence for a variety of convictions relating to burglary.

133. *See* p. 1125, *supra.*

ware. Broadly stated, the State must decide whether to embark upon an expensive program of building and staffing more prisons like DCC or to pursue vigorously the development of less costly alternatives to prison, such as those discussed above. The difficulty in making this decision cannot be minimized, but the necessity for State legislative action cannot be ignored. The high social and financial costs of inaction will be paid by the citizens of Delaware.